UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

JS-6

**Case No.** CV 17-02185-MWF (JCx)          **Date:  November 8, 2017**

Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

          Deputy Clerk:                      Court Reporter:
          Rita Sanchez                       Not Reported

          Attorneys Present for Plaintiff:   Attorneys Present for Defendant:
          None Present                       None Present

**Proceedings (In Chambers):**          ORDER RE MOTION TO DISMISS
                                        PLAINTIFF'S FIRST AMENDED
                                        COMPLAINT [31]


        In this action, Esplanade, the solely-owned corporation of well-known
Hollywood writer, director, and producer Gary L. Goldman, seeks to prove that Disney
stole the idea for its hit animated film *Zootopia* from Goldman.  In support of its
claims, Esplanade alleges that Goldman twice shared a synopsis and treatment for the
movie *Looney*, along with his ideas and artwork for a larger franchise called
"Zootopia," with Disney agents and executives.  The parties presently dispute only
whether Goldman's materials are sufficiently similar to the Disney film to support an
action for copyright infringement.  In other words, the Court assumes that Disney had
the opportunity to copy Goldman's work.  The question is whether Disney copied
original, protectable elements of Goldman's work.

        The Court has now had the opportunity to review Goldman's work and compare
it to *Zootopia*.  Applying the "extrinsic" portion of the Ninth Circuit's "substantial
similarity" test, the Court concludes that the plots, themes, dialogue, moods, settings,
pace, characters, and sequence of events in *Zootopia* and Goldman's work are not
sufficiently similar for Esplanade to proceed beyond the "extrinsic" portion of the test.
Esplanade is thus not entitled to have a jury determine whether the works are
intrinsically similar.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Before the Court is Defendants The Walt Disney Company, Disney Enterprises, Inc., Walt Disney Pictures, ABC, Inc., Buena Vista Home Entertainment, Inc., Disney Consumer Products, Inc., Disney Consumer Products and Interactive Media, Inc., Disney Book Group, LLC, Buena Vista Books, Inc., Disney Interactive Studios, Inc., Disney Store USA, LLC, and Disney Shopping, Inc.'s (collectively, "Disney") Motion to Dismiss Plaintiff's Firs Amended Complaint, filed August 28, 2017.  (Docket No. 31).  On September 11, 2017, Plaintiff Esplanade Productions, Inc. ("Esplanade") filed an Opposition.  (Docket No. 32).  On September 18, 2017, Disney filed a Reply. (Docket No.33)  The Court held a hearing on October 2, 2017.

Disney's Motion is **GRANTED** *without leave to amend*.  As a matter of law, the Court can now determine that the extrinsic portion of the substantial similarity test is not met.  Of course Plaintiff relies on *Metcalf*, but there is nothing particularly striking in the alleged similarity between *Looney* and the Disney *Zootopia*. Esplanade's copyright infringement claim is therefore **DISMISSED**.

The Court declines to exercise supplemental jurisdiction over Esplanade's state law claims, which are **DISMISSED** *without prejudice* to Esplanade's pursuing those claims against Disney in state court.  The analysis necessary to determine the California claims is not necessarily precisely the same as that necessary for substantial similarity under copyright.  The California courts are the appropriate forum to make that determination.  Disney can afford it.

I.    BACKGROUND

     A.    Procedural History and Judicial Notice

On March 21, 2017, Esplanade filed its original 36-page Complaint, alleging that, through its creation and distribution of *Zootopia*, Disney had expropriated original, protectable elements of *Looney*, the creation of Gary Goldman, Esplanade's founder, CEO, and sole shareholder.  Esplanade asserted claims of copyright infringement, breach of implied contract, breach of confidence, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)              Date:  November 8, 2017

Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

*seq.*  On July 11, 2017, the Court granted Disney's motion to dismiss the Complaint, dismissing Esplanade's copyright infringement claim with leave to amend and deferring consideration of its state law claims until Esplanade filed an amended complaint.  (Docket No. 24).  The Court dismissed the Complaint, in large part, because Esplanade had "fail[ed] to include, at the least, any clear summary of the *Looney* plot, dialogue, themes, and so on…," which rendered a meaningful comparison of *Zootopia* and *Looney* impossible.  (*Id.* at 19).  The Court instructed Esplanade to cure these deficiencies "either by providing a clear and detailed description of the allegedly infringed works, or by attaching them to the Complaint – at which point the Court will again consider whether the works are substantially similar to *Zootopia*."  (*Id.*).

        On August 3, 2017, Esplanade filed a 67-page FAC, annexed to which are ten exhibits, including the *Looney* "Character Descriptions, Character Illustrations, Synopsis, and Treatment" that Goldman authored.  (FAC (Docket No. 27), Ex. 1).  On August 28, 2017, Disney filed its present Motion to Dismiss the FAC; on September 11, 2017, Esplanade filed its Opposition; and on September 18, 2017, Disney filed its Reply.  (Docket Nos. 31-33).

        For the same reasons noted in its previous Order (at 2-3), the Court takes judicial notice of the animated motion picture *Zootopia*, a DVD copy of which has been provided to the Court and which the Court has viewed.

## B.       Factual Background

### 1.       Goldman's Contemplated "Zootopia" Franchise

***Esplanade and Goldman***: Esplanade is a California corporation formed by Goldman in 1984 to produce motion pictures and as a vehicle for his various projects as a writer, director, and producer.  (FAC ¶ 23).  Goldman has since been Esplanade's CEO, director, employee, and sole shareholder.  (*Id.*).  Goldman has had a long and successful career in film, and has worked in one capacity or another on a number of well-known motion pictures, including *Total Recall*, *Basic Instinct*, and *Minority*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)              Date:  November 8, 2017
Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

*Report*.  (*Id.* ¶¶ 24–29).  Between 2000 and 2009, Goldman, developed a franchise for motion pictures, television programs, and derivative products that he called "Zootopia."  (*Id.* ¶ 30).  The franchise is "based on an animated cartoon world that metaphorically explores life in America through the fictional setting of a diverse, modern, and civilized society of anthropomorphic animals."  (*Id.*).

     ***The* Looney *Synopsis:*** Goldman wrote a synopsis and treatment of the first segment of the prospective franchise, a live-action film titled *Looney* that he registered with the Writers Guild of America, West, Inc., on August 17, 2000.  (*Id.* ¶ 33, Ex 1 at 16-27).  The *Looney* synopsis tells the story of Zeke Amory, a "brilliant," "eccentric," "unstable," "hyperactive," and "like a little bit crazy" "cartoon genius" who "is the creator of the animated television show entitled 'Zootopia' with characters representing aspects of his personality."  (*Id.* ¶ 112; Ex. 1 at 16, 26, 27).  Goldman imagined that Zeke would be "played by Jim Carey or Robin Williams or Eddie Murphy – a comedy virtuoso."  (*Id.*, Ex. 1 at 16).

     Zeke, who grew up in either Kansas or Nebraska and was bullied by a star football player named Eddie Uglesich (aka Oog), "started out drawing cartoons for his college paper, then he got popular and a movie studio bought his cartoon strip and brought him out to Hollywood and built a show out of it, and it became a worldwide sensation – Like the Simpsons, but with the zaniness and energy level of Looney Tunes."  (*Id.* at 16-18, 26, 27).  The success goes to Zeke's head: "[h]e's gone from being a nice, sweet, sensitive guy to being universally known as one of the biggest egomaniacs in Hollywood."  (*Id.* at 16).  He's "been married five times, always to gorgeous starlets or models"; he "lives in a giant, gauche mansion filled with gaudy furniture"; he has an English butler; he drives a Ferrari; he "acts like a tyrant."  (*Id.* at 16-17).

     Zeke arrives at the studio to attend a dubbing session; this is when the audience becomes acquainted with Zeke's cartoon called "Zootopia."  (*Id.*).  The premise of Zeke's "Zootopia" is a zoo where, "[e]very morning, the animals punch in and go to work" and "[a]t closing time, they punch out and go home."  (*Id.*).  "It's a metaphor for life and for America."  (*Id.*).  The "Zootopia" cast consists of seven "high school kid"

CIVIL MINUTES—GENERAL                                             4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 17-02185-MWF (JCx)              Date:  November 8, 2017**

Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

animals (Roscoe, a hyena; Hugo, an aardvark; Monty, a sloth; Fuzz, a koala; a bear that
is alternatively referred to as Griz or Cody; Cha-Cha, a cheetah; and Mimi, a squirrel),
two "adult" animals (Max, an ibex; and Miss Quilty, an ostrich), and a human
zookeeper named Dodo, whose face the audience never sees.  (*Id.*).  These animal
characters, which appear to have been more fully developed by Goldman at some other
time (*see id.* at 1-6), are discussed in more detail below.

        Cutting back to non-animation live action, Zeke is sitting with his writing /
animation / voiceover partner Robin (imagined as Renee Zellweger).  (*Id.* at 17).  Zeke
and Robin have known each other since junior high, dated in the past, and were
engaged to be married "when he made his big studio deal and came out to Hollywood."
(*Id.*).  Zeke broke off the engagement after his success went to his head, but he and
Robin continued to work together.  (*Id.* at 18).  Robin is "the only person who can
stand up to Zeke – and who he listens to."  (*Id.*).  Robin and Zeke receive a visit from
Oog (Zeke's high school tormentor, now mellowed), who is in town with his daughter,
and Robin leaves with Oog and his daughter to show them the studio.  (*Id.*).  Zeke's
boss Leon, "[o]ne of the few people who's a bigger asshole than Zeke," enters the
scene and becomes angry over Zeke's refusal to endorse some unspecified product that
has the capacity to "poison the bodies and souls and minds of children"; this is when
the audience is meant to realize Zeke is maybe not such a bad guy.  (*Id.*).  The next
day, Leon fires Zeke and replaces him with Norman, a "pimple-faced Jewish
adolescent."  (*Id.*).  Zeke is dragged out of the building by security guards.  While he is
driving away erratically in his Ferrari, he sees and hears one of the animal characters
from his "Zootopia" show: a precursor to the delusions he will soon experience.  (*Id.* at
20).

        Zeke's life then begins to fall into disarray.  His current wife (Pamela Anderson)
leaves with the personal trainer; lawsuits are filed against him; nobody shows up to a
charity event he hosts at his house besides Robin and Oog; his butler disrespects him;
his mansion is repossessed; he is arrested for breaking into his wealthy friend's home
when he has nowhere else to go.  (*Id.* at 19-20).  All the while, he is periodically
visited by the animal characters from "Zootopia."  His mother (who appears to Zeke as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Miss Quilty, the ostrich) shows up to bail him out of jail and flies him back to Topeka, where his dad (who appears to Zeke as Max, the ibex), picks them up at the airport and berates Zeke for not getting a law degree.  (*Id.* at 21).  Zeke moves back into his childhood home where he relives "the adolescent nightmare that inspired his creative vision in the first place."  (*Id.* at 21, 26, 27).

Back in Topeka, Zeke is continuously visited by his cartoon characters.  (*Id.* at 22).  He learns that Robin and Oog are now engaged, which prompts the realization that he is still in love with Robin.  (*Id.*).  He is harassed by cartoon characters while driving and gets into a terrible accident.  (*Id.*).  He ends up in the hospital and then the insane asylum.  (*Id.*).  While in the insane asylum, Zeke's psychiatrist helps him "realize that his 4 [cartoon] characters are all him," and "that he has to master them, integrate them."  (*Id.*).  Zeke is then on the rebound.  Ultimately, he shows up at Robin and Oog's wedding, Robin calls off the wedding, and "Zeke and Robin kiss and get together."  (*Id.* at 23).

**Goldman's / Zeke's "Zootopia" Characters:**  At some point between 2000 and 2009, Goldman developed the prospective *Looney* / "Zootopia" franchise's animated characters (*i.e.,* the ones in Zeke's cartoon), and paid an animator/cartoonist to design a set of visual mock-ups of the characters:



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

(FAC ¶ 32).  As conceived by Goldman, these characters are (from left to right):

- **Mimi (a squirrel – main character):** "The only wild animal on the show.
  Mimi is a cute, curvaceous, sexy squirrel who lives in a tree in the zoo and
  who can come and go as she pleases…  She is the voice of common-sense, as
  opposed to the zoo creatures in captivity who endlessly theorize about the
  world, but really don't know anything about it… Mimi likes all of these guys
  [in the zoo] and could fall for any of them; but each of them has an obsession
  or neurosis which interferes with any romance.  You might say that her only
  flaw is that she's hanging out with these losers [the other zoo animals]; but
  she likes them.  And they make her laugh.  They all treasure her as a friend,
  just not as a lover… She's romantic… She's very energetic and enthusiastic.
  Her bushy tail is very expressive – and kind of sexy."

- **Fuzz (a koala – main character):** "The leader of the gang.  He looks cute,
  but he's a little Napoleon – consumed with unbridled ambition.  Nobody
  takes him seriously as a lover or leader, and this really burns him.  So he has
  become very foul-tempered, biting and scratching anyone who treats him as
  inconsequential or cute.  He hates that the zoo has named him Fuzz.  Fuzz
  really wants to challenge Kody the Bear for leadership of the animals and for
  the affections of Cha-Cha the Cheetah…  He's frequently rescued by the
  zookeeper, who thinks he's really cute and helpless."

- **Hugo (an aardvark – main character):** "A strong, athletic, but dorky guy
  who is obsessed with self-improvement.  He wants to acquire the skills,
  knowledge, and techniques to become successful and popular.  But he will
  never, ever, ever succeed…  Hugo believes that an animal can be whatever it
  wants to be.  Our characters, he believes[,] are the result of our environment
  and will.  There is no such thing as 'animal nature.'  'If you want to be an
  elephant, you can be an elephant.'  Hugo craves praise and acceptance.
  Consequently, Fuzz is always able to manipulate him into doing his bidding.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Hugo would be very happy to have June as a girl friend, but Fuzz always tells him he can do better.  And this ruins his chance at happiness."

- **Roscoe (a hyena – main character):** "A prankster.  A jolly guy, out for a good time, likes to hang out, doesn't like to work.  A good pal to his friends.  But he's ugly and uncouth; from a 'low-class' family.  He has an obnoxious laugh, bad posture, and a bad attitude.  He knows he's an outcast that will never get ahead in business or in a profession; and that no female wants him… But instead of being bitter about it, he revels in being offensive… Like a pimple-faced adolescent boy, he has a volcanic libido; but he has no hope of fulfilling it with an actual female.  Instead, he satisfies himself with harmlessly harassing and grossing-out females of all species."

- **Monty (a sloth – main character):** "A highly educated and cultured epicure who is monumentally lazy.  He sees through all the others; and is highly principled about speaking the truth and not compromising his aesthetic values… He's incredibly pessimistic and negative.  He has no hope that he can change or improve; or that anyone else can change or improve.  Consequently, he accepts people in the way they are; interacts with them; but calls a spade a spade, to their faces; and is a devastating critic… He is devastatingly funny – which is why it's fun to have him around."

- **Cody / Griz (a Kodiak bear – supporting character):**  "He takes his leadership and superiority for granted.  He gets exasperated that Fuzz and his nobodies keep irritating him and picking on him and challenging him.  Fuzz always manages [to] get[ ] away unharmed, but his allies always end up getting massacred by Bear.  [His] flaw is his pride.  Thinking that he is too mighty to be defeated.  Goliath.  Plays on the football team… Monty mercilessly makes fun of him, like a court jester."

- **Cha-Cha (a cheetah – supporting character):** "Gorgeous sex goddess cheerleader.  Her goal is to be praised and to have the Alpha Male of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:        Esplanade Productions, Inc. *-v.-* The Walt Disney Company, et al.

animal kingdom.  She constantly tries to make Cody the Bear jealous.  So she
flirts with Fuzz and the others, who can't help falling for her, even though
they know she's just using them.  Inevitably they get clobbered by Cody,
who goes off with Cha-Cha."

- **Miss Quilty (an ostrich – supporting character):** "Very prissy and vain,
  but not too attractive, large, with big hair, and tiny lips at the end of a long,
  long snout.  She teaches Biology and Ecology to animals.  She is miserable
  being married to Max and constantly complains, 'I should never have married
  a marsupial.'"

- **Max (an ibex – supporting character):** "Sporty.  Not too bright.  He runs a
  bar … THE WATERING HOLE, and has big horns that he is proud of.  The
  gang hangs out there, where Max[ ] pretends to know everything about life.
  But he's got it all wrong.  He is married to Miss Quilty, but he is so dense
  and self-absorbed that he is completely oblivious to her inner needs.  They
  have a terrible marriage, but he doesn't realize it."

(*Id.*, Ex. 1 at 1-6).

**Goldman Pitches the Looney / "Zootopia" Franchise:**  In 2000, a company
called Mandeville Films had a first-look production contract with Disney.  (*Id.* ¶ 36).
Goldman met with the then-CEO of Mandeville Films, David Hoberman, at Disney's
Burbank offices to pitch his *Looney* / Zootopia franchise.  (*Id.*).  During the meeting,
Goldman shared with Hoberman his character illustrations and his ideas for the themes,
plot, and settings for the proposed franchise.  (*Id.* ¶ 38).  This was done with the mutual
understanding that Mandeville would compensate Esplanade if it decided to use any of
Goldman's ideas or characters, as is common practice in the film industry.  (*Id.* ¶¶ 35,
37, 38).  Although Hoberman took copies of the character illustrations and other
written materials after the meeting, and on information and belief gave the materials to
Disney, Disney ultimately declined to acquire the rights to the proposed franchise.  (*Id.*
¶¶ 38–39).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

After further developing the proposed franchise, Goldman tried again to pitch it to Disney, in 2009.  (Compl. ¶ 40).  On February 12, 2009, Goldman met with Brigham Taylor, who at the time was Walt Disney Pictures' Executive Vice President of Production and Development, to pitch his *Looney* / Zootopia franchise.  (*Id.* ¶¶ 40-42).  During the meeting, Goldman gave Taylor copies of the *Looney* / Zootopia character descriptions and illustrations, treatment, and synopsis.  (*Id.* ¶ 42).  Taylor took copies of Goldman's materials and, on information and belief, gave them to others at Disney.  (*Id.*).  Again, Disney declined to acquire Esplanade's rights.  (*Id.* ¶ 43).

On February 10, 2017, about a year after Disney had released *Zootopia* (*see infra*), Esplanade registered the character descriptions and illustrations for the proposed franchise, and the synopsis and treatment of *Looney*, with the United States Copyright Office.  (Compl. ¶¶ 34, 141).  Esplanade called the franchise "Zootopia."  (*Id.*).

### 2.  *Zootopia*

At some time after the Goldman's 2009 meeting with Taylor, Disney began to develop the animated motion picture that ultimately became *Zootopia*.  (*Id.* ¶ 44).  Disney completed *Zootopia* on February 11, 2016, and began distributing it in the United States on March 4 of that year.  (*Id.* ¶¶ 45, 46).  *Zootopia* grossed more than a billion dollars at the box office, making it the highest-grossing original animated film of all time.  (*Id.* ¶ 46).  Subsequently, Disney spun off the characters for use at theme parks and in merchandising, as toys, games, books, comics, video games, dolls, clothing, kitchenware, and the like.  (*Id.* ¶¶ 48–49).

*Zootopia* takes place in a world populated entirely by anthropomorphic animals.  The plot proceeds as follows:

Judy Hopps, a young-adult rabbit, lives in Bunnyburrow, a rural carrot-farming community.  Judy dreams of becoming a police officer in Zootopia, a nearby metropolis.  Judy's parents, also rabbits, do not discourage her from being a police officer, but worry that the job is dangerous and so extoll the virtues of carrot farming in Bunnyburrow.

---

CIVIL MINUTES—GENERAL                                                10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)            Date:  November 8, 2017
Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Judy moves to Zootopia, where she graduates from the police academy as the valedictorian, becoming the only rabbit cop on a police force populated by much larger animals.  Despite Judy's obvious pluck and lofty ambitions, Chief Bogo, a buffalo, assigns Judy to parking enforcement duty (an undesirable position) because he doubts that a rabbit can be a good cop.  Judy is clearly disappointed, but puts on a good face, determined to be the best parking enforcement officer she can possibly be.

On her first day, while writing parking tickets, Judy sees Nick Wilde and Finnick, a couple of con-artist foxes playing the roles of father (Nick) and toddler (Finnick).  They are trying to buy a popsicle at an ice cream shop for elephants.  The elephant proprietor refuses to serve them because he does not care for foxes.  Judy intervenes and buys a giant popsicle for Finnick.  Soon after, she sees Nick selling small chunks of the giant popsicle to others.  She realizes that Nick hustled her.

The next day, Judy abandons her parking duty post to arrest Duke Weaselton, a street-tough weasel who stole a bag of crocus bulbs.  Back at the station, as Chief Bogo is in the middle of reprimanding her for abandoning her post, Mrs. Otterton, a citizen of Zootopia, bursts into Bogo's office and asks for help finding her husband Emmitt, one of several predators who have recently gone missing.  Much to Bogo's chagrin, Judy volunteers.  Bogo gives her 48 hours to solve the case, or else she must resign from the Zootopia police department.  After realizing that Nick was present the last time Emmitt Otterton was seen, Judy blackmails Nick (by recording his admission of tax evasion with her carrot-pen recorder) into helping her find him.

Judy and Nick learn that Emmitt Otterton had been in a limousine owned by Mr. Big, an arctic shrew and organized-crime boss, when he went "savage" and attacked the chauffer, a panther named Manchas.  Judy and Nick visit Manchas at his home, and he tells them that Otterton said something about "night howlers" just before he attacked.  Moments later, Manchas himself turns "savage" and chases Judy and Nick through a jungle scene.  Judy saves Nick by trapping Manchas and calls the police department for backup.  By the time other police officers arrive, Manchas has disappeared.  Chief Bogo demands Judy's resignation, but Nick reminds Bogo that she still has another ten hours to solve the mystery.  On the way back to downtown

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                 Date:  November 8, 2017
Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Zootopia, Nick tells Judy that he was bullied as a child because his peers perceived
him as untrustworthy, just because he is a fox.  Nick having revealed that even a fox
can be vulnerable, Judy and Nick are now quite obviously friends.

        Judy and Nick go to City Hall and meet with Assistant Mayor Bellweather, a
sheep, who gives them access to the city's traffic cameras.  They review the footage
and see that Manchas was captured by wolves – perhaps the "night howlers" that
Emmitt Otterton referenced before he attacked Manchas.  Judy and Nick locate
Manchas and other predators at the Cliffside Asylum, and learn that Mayor Leondore
Lionheart, a lion, has held them captive at the asylum so that a scientist could try to
determine the cause of their "savage" behavior.  Mayor Lionheart and others are
arrested for false imprisonment.

        After Mayor Lionheart's arrest, Judy is treated as a hero for having solved the
case.  Judy asks Nick to join the police department and to be her partner.  During a
press conference, Judy observes that all the missing animals were predators and
suggests that there may be biological reasons for them turning "savage."  This deeply
upsets Nick, himself a predator, who declines Judy's offer to join the police force and
storms off.  Judy's comments also cause tension between the predators and prey of
Zootopia.  Judy, feeling guilty about her comments, resigns from the police force over
Chief Bogo's (who is now a fan of Judy) protestations, and returns to Bunnyburrow.

        Back home in Bunnyburrow, Judy learns that "night howlers" are not wolves,
but plants that can have psychotropic effects on animals, causing them to act
"savagely."  Having come to this realization, Judy races back to Zootopia in an old
carrot-farming truck.

        Once back in Zootopia, Judy and Nick reunite and they confront Duke
Weaselton about the bag of crocus bulbs Judy had caught Weaselton stealing.
Weaselton told them that he gave the bulbs to a ram named Doug Ramses.  Judy and
Nick find Doug Ramses manufacturing a "night howler" serum in a laboratory hidden
in a Zootopia subway tunnel.  They discover that Doug has been shooting predators

_____
                        CIVIL MINUTES—GENERAL                        12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

with darts filled with the serum; this is what has been causing these animals to turn "savage."

A sample of the "night howler" serum in hand, Judy and Nick are confronted by Assistant Mayor Bellweather in the Zootopia Natural History Museum.  Bellweather seizes the serum and admits that she is the mastermind behind a plot to turn prey (the vast majority of Zootopia) against predators (a small minority) and to seize the mayoralty from Mayor Lionheart (a predator, obviously).  While Judy and Nick are trapped in a diorama of some sort, Bellweather shoots Nick with the serum so that he will turn "savage" and kill Judy, and she calls the police to arrest Nick.  Bellweather didn't realize that Nick and Judy had replaced the serum pellets with blueberries.  Once the police arrive, Judy pulls out her carrot-pen recorder and replays Bellweather's confession, which Judy had surreptitiously recorded.  Her plot to seize power exposed, Bellweather is arrested.

The animals that were thought to have turned "savage" are cured, and the predators and prey of Zootopia trust each other once again.  Judy rejoins the police force and Nick graduates from the police academy, becoming Zootopia's first fox cop and Judy's partner.

## II.   DISCUSSION

### A.   Legal Framework

#### 1.   Pleading Standard

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Court must disregard

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

allegations that are legal conclusions, even when disguised as facts.  *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014).  "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'"  *Eclectic Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations omitted).

        The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief.  *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Ebner v. Fresh, Inc.*, No. 13-56644, 2016 WL 5389307, at *2 (9th Cir. Sept. 27, 2016) (as amended) (quoting *Iqbal*, 556 U.S. at 679).  Where the facts as pleaded in the complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."  *Eclectic Properties*, 751 F.3d at 996–97; *see also Somers*, 729 F.3d at 960.

## 2.      Copyright Infringement Generally

        "To prevail on [a] copyright infringement claim, [a plaintiff] must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010) (citation and internal quotation marks omitted).  Ownership is not disputed for purposes of this Motion.  Accordingly, the Court focuses on whether Esplanade has adequately alleged copying in the FAC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                  Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

A plaintiff may establish copying through direct or circumstantial evidence.  *See Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987) ("Because direct evidence of copying is rarely available, a plaintiff may establish copying by circumstantial evidence . . . .").  Circumstantial evidence of copying may include "(1) defendant's access to the copyrighted work prior to creation of defendant's work and (2) substantial similarity of both general ideas and expression between the copyrighted work and the defendant's work."  *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987).  'A plaintiff must show 'substantial similarities of *both* ideas and expression.'"  *Buggs v. Dreamworks, Inc.*, No. CV 09-07070 SJO (AGRx), 2010 WL 5790251, at *4 (C.D. Cal. Dec. 28, 2010) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984)) (emphasis in original).  Disney does not dispute access for purposes of this Motion, so the Court assumes that Disney had access to Esplanade's work and focuses on the issue of similarity.

"Under the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work."  *Benay*, 607 F.3d at 625.  But access or not, similarity is still required for a viable infringement claim.  As explained in Nimmer:

> Proof of access can logically aid in showing copying as a factual matter – added to the probative similarity that exists between two works, it can bolster the proof that one was in fact derived from the other.  But access logically exerts no impact on copying as a legal matter; no matter how steeped in plaintiff's work defendant may have been, if the resulting product is non-actionable as a matter of law, then the absence of substantial similarity that must underlie every successful claim still dooms the infringement suit.

4 *Nimmer on Copyright* § 13.03 (2017).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                 Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

### 3.      Extrinsic vs. Intrinsic Components of Substantial Similarity

"The substantial-similarity test contains an extrinsic and intrinsic component." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  A finding of substantial similarity under the extrinsic component is a necessary prerequisite to considering the intrinsic component, which is expressly reserved for the jury.  *See Shaw v. Lindheim*, 919 F.2d 1353, 1360–61 (9th Cir. 1990).  A failure to satisfy the extrinsic component on a motion to dismiss thus requires judgment for the defendant as a matter of law.  *See Funky Films*, 462 F.3d at 1077.

In *Funky Films*, the Ninth Circuit explained the components of the extrinsic component of the test:

> Extrinsic analysis is objective in nature.  It depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.  The extrinsic test focuses on ***articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events*** in the two works.  In applying the extrinsic test, this court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.

462 F.3d at1077 (quotation marks and citations omitted) (emphasis added).  As the Ninth Circuit has emphasized, the Court "must take care to inquire only whether 'the ***protectable elements, standing alone***, are substantially similar" and thus must "filter out and disregard the non-protectable elements" when considering substantial similarity.  *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)) (emphasis in original).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

### 4.      Can the Issue of Similarity Be Decided Now?

While the question of whether the allegedly infringing work is sufficiently similar to the allegedly infringed work to give rise to liability for infringement is often resolved on summary judgment or by a jury, there is no logical reason to delay the inevitable when the Court already has the allegedly infringed and infringing works before it on a motion to dismiss. Courts have decided issues of similarity based upon the pleadings and the works themselves before, and this Court sees no reason not to do it in this case. *See Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1111 (N.D. Cal. 2010) ("'When the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'") (quoting *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)); *Shame on You Productions, Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123 (C.D. Cal. 2015) (evaluating extrinsic factors and granting motions to dismiss and for judgment on the pleadings based upon lack of substantial similarity between plaintiff's screenplay and defendants' movie); *Thomas v. Walt Disney Co.*, No. C-07-4392 CW, 2008 WL 425647 (N.D. Cal. Feb. 14, 2008) (evaluating extrinsic factors and granting motion to dismiss based upon lack of similarity between the plaintiff's story and the film *Finding Nemo*).  Accordingly, the Court proceeds to consideration of the extrinsic factors.

### B.      Copyright Claim

#### 1.      *Zootopia* Movie

##### a.      Plot and Sequence of Events

The only plot (*i.e.*, at least minimally defined story) present in any of Goldman's work is in connection with *Looney*, the story of the rise and fall of Zeke, an eccentric animator.  Zeke comes from modest circumstances and rises to fame and success as a Hollywood animator, lets the fame go to his head, loses his sense of reality and sanity, gets fired by his difficult boss, and ends up back home in Topeka, where he realizes his

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:         Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

love for Robin, his ex-fiancée who he has known since junior high.  At the end of the
story, Zeke regains his sanity and wins back Robin.

Disney's *Zootopia* is the story of Judy, a rabbit from a rural carrot-farming
village who rises to prominence on the Zootopia police force by uncovering the
assistant mayor's scheme to turn prey against predators and solving a mystery that is
vexing the city.  Along the way, she grapples with and overcomes her own prejudices
(*e.g.,* against foxes) to become friends and work partners with a member of a group
(foxes) that her group (rabbits) ordinarily wouldn't closely associate with.  She also
helps the citizens of Zootopia overcome their own prejudices and learn to trust one
another once again.

Esplanade's effort to make the plots of *Looney* and *Zootopia* seem similar are
strained.  For example, in the FAC, Esplanade alleges that:

> "Although the stories [of *Looney* and *Zootopia*] are not
> identical, they have similar plot points and sequences of
> events that play out similar conflicts among the characters,
> including conflicts about whether they can become what they
> want to be; whether they can overcome prejudices in society
> and within themselves; whether they can improve and define
> themselves despite their natures; whether the diverse society
> can live up to utopian ideals and treat others fairly as
> individuals, based on merit and not natural order; and
> whether they can strike a balance between utopian and
> deterministic world views, nature and individuality, and self-
> acceptance and self-improvement."

(FAC ¶ 117).  These are all themes, not plot points or sequences of events.  They are
also themes that the Court is largely unable to detect in *Looney* (*e.g.*, the idea of
"whether the diverse society can live up to utopian ideas and treat others fairly as
individuals" is not present in *Looney*) and that are too general to be protected by
copyright law.  The ideas that are present in both *Looney* and *Zootopia* (*e.g.*,

CIVIL MINUTES—GENERAL                                        18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

| | |
|---|---|
| **Case No.** CV 17-02185-MWF (JCx) | **Date:** November 8, 2017 |
| Title: | Esplanade Productions, Inc. *-v.-* The Walt Disney Company, et al. |

"becoming what you want to be" despite modest beginnings and, perhaps, "self-acceptance and self-improvement") are both broad and well-worn, and thus not protectable.

Esplanade's more specific attempts at making the plots of *Looney* and *Zootopia* appear similar are also lacking.  (*See* FAC ¶¶ 125(a)-(x)).  For example, Esplanade alleges that both Zeke and Judy "grow up living with their parents in small town America," "express career dreams that worry their parents," "go to educational institutions to advance their career goals," "move to the big city," "come up against strong and powerful bosses that do not like them," "take principled stands," "engage with partners of the opposite gender," "achieve tremendous success … in their jobs," face some "job crisis," and then "move back to their parents' houses in the small towns."  (*Id.* ¶¶ 125(a), (c)-(f), (h)-(j), (m), (n)).  These allegations suggest only that *Zootopia* and *Looney* share a well-trodden "rags to riches" story arc that is not protectable.  *See Benjamin v. Walt Disney Co.*, 2007 WL 1655783, at *6 (C.D. Cal. June 5, 2007) (idea of "females that have escaped their humble past to pursue their dreams of working and living in the big city" unprotectable).

Esplanade also mischaracterizes certain plot points in *Zootopia* to make it seem more similar to *Looney*.  For example, Esplanade alleges that both Judy and Zeke "go to extreme lengths in pursuit of success, and even abuse their power.  Zeke writes, directs, produces, and does the voices for his Zootopia television show, acting like a "tyrant"; Judy writes 200 tickets instead of just her quota of 100 as an overzealous meter maid, and wildly pursues a suspect through the city."  (Complaint ¶ 125(g)).  In, *Zootopia*, Judy's writing of 200 tickets is not portrayed as overzealousness or an abuse of power; it is portrayed as Judy making the most of an assignment she'd prefer not to have – *i.e.,* "making lemonade" when "life gives you lemons."  Esplanade also attempts to portray Judy's re-partnering with Nick in *Zootopia* and Zeke's re-partnering with Robin as similar.  (*See id.* at ¶¶ 125(r)-(w)).  These plotlines are not similar.  Judy and Nick reunite on a professional level after overcoming a setback – a "getting the team back together" type of thing.  Zeke and Robin reunite romantically

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

after Zeke is able to tame his own inner demons and Robin decides to leave Oog at the altar in favor of Zeke.

To the extent a "plot" can be divined from the character descriptions of Goldman's animated animals, here it is: seven high-school-aged and two adult animals live in a zoo operated by an unseen human zookeeper; the adults are a teacher and a bar proprietor; the male adolescent animals engage in various unspecified schemes and seek popularity and romance, particularly with Cha-Cha the cheetah; Mimi the squirrel would like to be in a romantic relationship, but none of the male characters are romantically interested in her; Cody the bear physically assaults the less physically imposing male animals.

Esplanade alleges that the animated portion of *Looney* (*i.e.,* Zeke's Zootopia) shares a similar plot to *Zootopia* because:

> Both [works] involve small, cute, furry female animals who are outsiders to "Zootopia."  (Mimi in the Goldman Zootopia and Judy in the Disney Zootopia).  They are actively disrespected and dismissed by other animals, who are more dominant in nature, because of their species, and they strive to overcome that societal prejudice.  Each of them acts bravely and determinedly to help others in trouble, particularly by repeatedly using her small size to get in and out of places where the characters are in trouble.  They develop friendships with abrasive predators in Zootopia (Roscoe in the Goldman Zootopia and Nick in the Disney Zootopia).  The predator character is also subjected to prejudice because of his species, and he reacts by scheming, pulling pranks and engaging in 'obnoxious behavior.'  The two contrasting characters team up.  She is an enthusiastic utopian while he is a cynical deterministic, and the stories play out that conflict, *e.g.*, whether one can evolve and define oneself, and become what he or she wants to be.  Each plot

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

> develops in the context of a scheme by a third character
> (Fuzz in the Goldman Zootopia and Bellweather in the
> Disney Zootopia), a small prey animal, to upend the power
> structure, but the scheme goes too far and fails.

(*Id.* ¶ 118).

Again, much of this relates to themes – *e.g.,* striving to overcome societal
prejudice, acting bravely and determinedly to help others in trouble – rather than a
plotline.  Perhaps the ideas of small, furry creatures "develop[ing] friendships with
abrasive predators" and being involved, in some unspecified way, in "a scheme by a
third character … to upend the power structure," could, in a very basic sense, be
described as a plotline.  But they are far too basic and nonspecific to be protectable.
*See, e.g., Buggs*, 2010 WL 5790251, at *5 ("the basic plot of pests with human
attributes getting flushed [down a drain] and saving their communities is not
protectable"); *Campbell*, 718 F. Supp. 2d at 1112 (plot of "a cocky young race-car
driver … who learns life lessons from an older mentor" is not protectable); *Cavalier*,
297 F.3d at 824 ("the general premise of a child, invited by a moon-type character,
who takes a journey through the night sky and returns safely to bed to fall asleep" was
a "basic plot idea," and thus unprotectable).

Moreover, Esplanade is selectively reconfiguring certain descriptions of the
characters that were to appear in Zeke's "Zootopia" cartoon – from among a
scattershot of descriptions – as a plot.  This is problematic because Goldman's
character descriptions could just as easily be used to come up with an entirely different
plot.  For example, based on the character descriptions, the plot of Zeke's "Zootopia"
could just as easily be "a newcomer squirrel (Mimi) moves to the zoo and looks for
love in all the wrong places" or "Monty the sloth and Cody the bear engage in a battle
of brains versus brawn."

Neither the plots nor the sequences of events in Disney's *Zootopia* and
Goldman's contemplated *Looney* / "Zootopia" franchise are similar.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

### b.       Themes

Esplanade identifies the shared themes of Disney's *Zootopia* and Goldman's *Looney* / "Zootopia" at paragraph 102 of the FAC.  Most of them are abstract, generic and well-trodden, and thus unprotectable.  For example, whether "one can become anything he or she wants to be," whether "one can overcome … the prejudices inherent in a diverse society … [and] within oneself," or whether "characters can achieve success while upholding moral and ethical behavior" are too generic to be protectable. *See, e.g., Cavalier*, 297 F.3d at 828 ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature."); *Basile v. Warner Bros. Entm't, Inc.*, No. CV 15-5243-DMG (MRWx), 2016 WL 5867432, at *8 (C.D. Cal. Jan. 4, 2016) ("General themes such as human origin and good-versus-evil are familiar stock themes that may not serve as grounds for substantial similarity.") (internal quotations and citations omitted); *Campbell*, 718 F. Supp. 2d at 1113 ("[A]lthough the works share themes of self-reliance and the importance of friendship and teamwork, these themes often predominate stories of competition, especially where the protagonist begins the story as cocky and self-centered, and are thus generic and not protectable.").

To the extent Esplanade cites somewhat less generic themes, they are undetectable in Goldman's *Looney* / "Zootopia" work.  For example, Goldman's work does not actually implicate questions of whether "a diverse society can live up to its utopian ideals and treat others justly as individuals and not stereotypes" or "whether civilization is not nearly as far removed from the primitive and natural state as most assume" any more than *any* screenplay involving animals and a zoo could be said to implicate such themes.

### c.       Character Designs

As with the original Complaint, the FAC includes the following chart comparing the character designs and artwork from Goldman's *Looney* / "Zootopia" (the characters on the left in each pair) with those from Disney's *Zootopia* (the characters on the right in each pair):

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 17-02185-MWF (JCx)**              **Date:  November 8, 2017**
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Comparison of the Characters in the Goldman Zootopia (L) and Disney Zootopia (R)



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                 Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

The character designs were the one element of Goldman's *Looney* / "Zootopia"
and Disney's *Zootopia* that the Court had before it prior to issuing its previous Order
granting Disney's motion to dismiss Esplanade's original Complaint.  In that Order,
the Court held that the designs were not substantially similar:

> The differences between the character designs
> outnumber the similarities.  Most obviously, almost none of
> the above pairings actually include the same animals.  A
> hyena is not a fox (and in reality is a much larger animal than
> a fox) and a grizzly bear is not a water buffalo.  Additionally,
> the *Looney* characters are unclothed while the *Zootopia*
> characters are all elaborately costumed.  And the animation
> style itself is very different between the two sets of
> characters: whereas the Disney characters are typically cute
> and appealing, the *Looney* characters evoke a darker, seedier
> aesthetic.  The *Zootopia* characters appear generally clean,
> healthy, and well-built for their respective body types; by
> contrast, the *Looney* characters have generally slovenly
> physiques, poor posture, and circles under their eyes.
> Picking just one example, while Nick, the fox from *Zootopia*,
> sports smooth fur, a straight back, and a full bushy tail,
> *Looney*'s hyena slouches sheepishly, emphasizing his
> protruding, paunchy belly and disheveled fur; his scrawny,
> rather stunted tail is all but hidden.  The two character
> designs bear little resemblance to one another.

> Indeed, most similarities between the characters boil
> down to the fact that both ensembles consist of
> anthropomorphic animals whose attributes flow to some
> extent from their physical form.  That is, small animals are
> cute and feminine, traditional trickster animals appear sly,
> and large animals are strong.  The Complaint alleges that "the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

characters illustrated [in both works] are not true-life
depictions of real animals, nor are they generic or inherent in
nature; rather, they are original creative expressions of
animals of different species from different habitats in
different parts of the world and constitute a selection and
arrangement of expression."  (Compl. ¶ 79).  This allegation
is a generic observation, a *scéne-á-faire* flowing from the
very idea of anthropomorphizing animals.  Indeed, this
statement could be true of any number of animated, talking-
animal films created over the years, from *Robin Hood* (Walt
Disney Pictures 1973) to *Finding Nemo* (Walt Disney
Pictures 2003).  It likely is not protectable.  *See Mandeville-
Anthony v. Walt Disney Co.*, No. CV 11-2137-VBF (JEMx),
2012 WL 4017785, at *3 (C.D. Cal. July 28, 2012) ("[T]he
***idea*** of animated, anthropomorphic car characters is
unprotectable" as is "[t]he idea that some of the respective
car characters share attributes that flow from their make and
country of origin" because there is "'no property interest in
stereotyped characters.'") (emphasis in original) (quoting
*Midas Prod., Inc. v. Baer*, 437 F. Supp. 1388, 1390 (C.D.
Cal. 1977)).

(First Order at 13-16).

        Nothing has changed since the Court issued its previous Order; the
character designs are what they are.  Accordingly, the Court finds that the
character designs are dissimilar now for the same reasons it found they
were dissimilar then.

### d.        Character Traits

        To be deemed protectable in the Ninth Circuit, characters must meet a three-part
test, including a requirement that they be "especially distinctive."  *See DC Comics v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

*Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (requiring characters to (1) have "physical as well as conceptual qualities," (2) be "sufficiently delineated," and (3) be "especially distinctive" in order to receive copyright protection, and on application of the test, finding the Batmobile to be a protected character); *see also Walt Disney Prods. v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (finding Mickey Mouse to be a protected character); *Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1295–96 (C.D. Cal. 1995) (finding James Bond to be a protected character).  As described by Goldman in his work, most of the traits that the animated characters in Zeke's "Zootopia" possess are not especially distinctive.  For example, as to the main characters: Mimi is a "cute, curvaceous, sexy squirrel," who is also "romantic," "energetic and enthusiastic"; Fuzz the koala is "consumed with unbridled ambition" and is "foul-tempered"; Hugo the aardvark is "strong, athletic, but dorky" and easily manipulated by Fuzz; and Roscoe the hyena is an "obnoxious" "prankster" with a "bad attitude" who is also, somewhat contradictorily, "jolly."  These descriptions do not present clearly delineated or distinctive characters.

Even if some of the traits of the animated characters in Zeke's "Zootopia" were sufficiently distinct to be protectable, the characters in Disney's *Zootopia* do not share those traits.

**Judy / Mimi / Hugo:**  Esplanade alleges that Judy of Disney's *Zootopia* is similar to both Mimi the squirrel and Hugo the aardvark from Zeke's "Zootopia." (FAC ¶¶ 79-82).  She is not.  Judy is an optimistic rabbit who achieves her goals through pluck and hard work and helps others along the way.  Mimi is described as a "sexy squirrel who lives in a tree in the zoo and who can come and go as she pleases," who is also "romantic," "energetic" and "enthusiastic."  Apart from energy and enthusiasm, both extremely generic traits, Judy and Mimi have nothing notable in common.

Esplanade also attempts to draw a comparison between Judy and Hugo the aardvark because Hugo "believes that an animal can be whatever he wants to be" and so does Judy.  Judy, by overcoming preconceptions and fighting her way onto the Zootopia police force, *represents* the idea of being whatever you want to be.  Hugo, it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

seems, merely *believes* in that idea.  Indeed, Goldman describes Hugo as someone who makes efforts "to become popular and successful" but will "never, ever, ever succeed."  Judy, on the other hand, is popular and successful.

**Nick / Roscoe / Monty:**  Esplanade alleges that Nick of Disney's *Zootopia* is similar in personality to both Roscoe the hyena and Monty the sloth from Zeke's "Zootopia."  (FAC ¶¶ 83-86).  Nick is a smooth-talking, well-kempt fox who appears somewhat impervious and smug, but who is, deep down, a sensitive guy.  Nick is likeable; despite conning Judy into buying a giant popsicle at the beginning of the movie, he quickly wins her over.  Roscoe is "ugly and uncouth," "low-class," has "an obnoxious laugh, bad posture, and a bad attitude," and "a volcanic libido," and he spends his time "harassing and grossing-out females of all species."  Monty is a "highly educated and cultured epicure who is monumentally lazy."  Monty is "incredibly pessimistic and negative," but is a "devastating critic" and is "devastatingly funny."  Apart from being an anthropomorphic animal, the character of Nick bears almost no resemblance to the characters of Roscoe and Monty.

Esplanade's attempt to portray various peripheral characters as similar is similarly lacking.  For example, the only similarities between Chief Bogo, a buffalo, and Griz (sometimes referred to as Cody) the bear are that they are large, powerful animals.  Chief Bogo is an adult police chief who is intimidating but not violent, and who turns out to be an appreciative and friendly boss.  Griz (or Cody) is a teenage bear who plays on the high school football team and "massacres" and "clobbers" other animals.  Bellweather is a sheep who serves as assistant mayor and who appears to be devoted to her work and to the city of Zootopia but who is actually an overambitious schemer who puts her own desire for power ahead of everybody else's interests.  She bears no obvious similarities to Miss Quilty, a "prissy and vain" biology and ecology teacher who is in a miserable marriage.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

### e.    Dialogue

A successful claim of dialogue infringement requires "extended similarity of dialogue" between the two works.  *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988); *see also Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010) (rejecting claim of substantial similarity where there was only sporadic similarity of dialogue).  Moreover, "ordinary, common expressions . . . are not copyrightable."  *Bernal*, 788 F. Supp. 2d at 1072.

Esplanade cites three instances where the dialogue of characters in Disney's *Zootopia* bears some resemblance to Goldman's description of the characters in Zeke's "Zootopia":

- In Disney's *Zootopia*, Judy tells Finnick (disguised as a toddler), "You want to be an elephant when you grow up, you be an elephant."  Goldman described Hugo the aardvark as being someone who believes that "if you want to be an elephant, you can be an elephant."

- In Disney's *Zootopia*, Judy remarked that "this is Zootopia, anyone can be anything."  Goldman described Hugo the aardvark as being someone who believes that "an animal can be whatever he wants to be."

- In Disney's *Zootopia*, Nick observes: "Everyone comes to Zootopia thinking they can be anything they want.  Well, you can't.  You can only be what you are."  Goldman described Monty the sloth as having "no hope that he can change or improve; or that anyone else can change or improve."

*Zootopia*, which has a 110-minute running time, has no extended similarities in dialogue with Goldman's brief descriptions of the characters that were to appear in Zeke's "Zootopia" cartoon.  *See Braham v. Sony/ATV Music Publ'g*, No. CV 15-8422 MWF (GJSx), 2015 WL 7074571, at *5 (C.D. Cal. Nov. 10, 2015) (concluding that the repetition of the phrases "Haters gonna hate" and "Players gonna play" between two

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

songs was, in itself, insufficient to create a plausible case of copyright infringement); *Gallagher v. Lions Gate Entm't Inc.*, No. CV 15-2739-ODW (Ex), 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015) ("A mere three sentences taken from a 302-page book compared to three sentences from a 90-minute motion picture falls far short of the 'extended similarity' required for a finding of substantial similarity for dialogue."). And the dialogue from *Zootopia* that Esplanade identifies as being similar to portions of Goldman's character descriptions reflect sentiments that are too commonplace and ordinary to be protectable.

### f.    Settings

Esplanade alleges that the settings in Disney's *Zootopia* and Goldman's Looney / "Zootopia" because they are both "set in a motion picture cartoon world of animated animal characters … where the different species live together, with each species having its own neighborhood…[in] a society with an established class and power structure based largely on the animals' characteristics such as the nature of their species." (FAC ¶ 106). This reads far too much into Goldman's work, which nowhere suggests that the animals in Zeke's "Zootopia" live in different "neighborhoods" or that there is an overarching "class and power struggle" going on in the zoo. Goldman's work takes place in Hollywood, Topeka, and an animated zoo controlled by an unseen human zookeeper. *Zootopia* takes place in a computer-animated city called "Zootopia" that is divided into several temperature-controlled, unique zones to accommodate the anthropomorphic animals who live there, and the nearby rural community of Bunnyburrow.

Esplanade also argues that the "Mystic Springs Oasis" in Disney's Zootopia and the "Watering Hole" in Goldman's work are similar, and that both works feature "media venues where the heroes publicly express prejudice and damage important relationships." The Mystic Springs Oasis is a health spa / retreat; the Watering Hole is a bar managed by Max the ibex. The "media venue" that Judy "expressed prejudice" from was a press conference in the lobby of the police station. It is not clear where anyone in Goldman's work "expressed prejudice," but the Court surmises that the "media venue" Esplanade is referring to is the editing room at Zeke's Hollywood

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)               Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

cartoon studio, which is obviously not the lobby of a public building during a press
conference.  The settings are highly dissimilar.  *See, e.g.*, *Gallagher*, 2015 WL
12481504, at *10 (concluding that "the setting for half of *Cabin*'s scenes and an
integral aspect of the plot [is not] merely a minor difference"); *Shame on You
Productions*, 120 F. Supp. 3d at 1159 ("The mere fact that some portion of both works
occurs in a city is generic and inconsequential, and thus fails to meet substantial
similarity.") (internal quotation marks and citation omitted); *Benay*, 607 F.3d at 628
(holding that settings were not similar partly because "[t]he Film includes extended
scenes in a samurai village" and "[n]o such village appears in the Screenplay.").

g.       **Mood and Pace**

Esplanade alleges that the mood of Goldman's and Disney's works are similar
because they are "written for adults and children, with comic, social, and emotional
aspects" and that "both feature disappointment, disillusionment, and sadness, but also
comedy, healing, joy, and ultimate success."  It is not clear to the Court that Goldman's
work, which tells the story of Zeke, a mentally unstable cartoonist playboy, and
teenage animals with "volcanic libidos" and so forth was written for "adults and
children."  In any event, these are highly generic descriptions that could be applied to
many movies, and thus (even if accurate) do not give rise to substantial similarity of
mood.  *See, e.g., Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446, 1451 (9th
Cir. 1988) ("Both shows may be broadly described as comic, and they therefore have
similar moods.  Both works are quickly paced.  However, these similarities are
common to the genre of action-adventure television series and movies and therefore do
not demonstrate substantial similarity."); *Shame on You Productions*, 120 F. Supp. 3d
at 1158 (moods not similar just because "both works are light-hearted comedies that
involve a walk of shame").

More specifically, Esplanade alleges that both works are "psychodrama[s] about
madness," "adult toned political fable[s]," "comed[ies] of ideas, posing philosophical
questions about utopian societies, nature, and self-determination," and that both works
"teach[ ] that complexity is unavoidable, perfection is unattainable, and everyone is
flawed…"  (FAC ¶ 130).  These descriptions mischaracterize the works.  *Zootopia*,

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)              Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

which involves predator animals turning "savage" when they are injected with a
psychotropic drug, does not involve "madness" in the same way that *Looney*, which
involves a mentally unstable human, involves "madness."  And Goldman's work poses
no "philosophical questions about utopian societies" and does not "teach that
complexity is unavoidable."  It is a somewhat antic and raunchy story about teenage
animals who engage in various pranks and seek romance with animals of the opposite
sex.  *Zootopia* is feel-good movie about achieving your dreams and making the world a
better place that is punctuated by moments of humor and suspense.  The moods are
dissimilar.

Esplanade alleges that the pace of the works are similar because they
"sometimes exhibit[ ] frenetic energy for the exposition of comedy and uplifting
themes, while other times slowing down for the exposition of disappointment and
disillusionment."  (FAC ¶ 131).  This is again a description that could be applied to a
lot of movies.  Again, the description attempts to graft something onto Goldman's
work that is not obvious from the work itself.  *Zootopia* is a fast paced movie that
brings the audience from rural Bunnyburrow to urban Zootopia and then moves
between many different environs within Zootopia in rapid succession.  The story of
Zeke in *Looney* brings the audience from Hollywood to Topeka where Zeke is down
on his luck and hanging around his childhood bedroom, but where he ultimately wins
back Robin.  It is difficult to decipher what pace the story of the animals in Zeke's
"Zootopia" cartoon would be told in because there is not much of a story evident in
Goldman's character descriptions.  As best as the Court can tell, the story would
consist of teenage animals hanging around a high school and its environs and a bar
while devising various schemes to win popularity and romance.  The pace of
Goldman's work is not nearly as rapid-fire or action packed as *Zootopia*.

It is true, as the Esplanade alleges, that the title of *Zootopia* and the title
Goldman's contemplated *Looney* / "Zootopia" franchise are the same, at least as
described in the 2017 copyright.  (FAC ¶ 135).  Esplanade alleges that "'Zootopia' is
more than just a name:  it expresses theme, setting, and character, and it relates to
plot."  (*Id.*).  That may be so, but Goldman's work and *Zootopia* are dissimilar in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

almost every material respect, so the shared title does not save Esplanade's copyright infringement claim, as words and short phrases are not copyrightable.  *See Shame on You Productions*, 120 F. Supp. 3d at 1156 (collecting cases).

### h.      *Metcalf*: The Combination of Unprotectable Elements

Esplanade argues that, even if none of the individual elements discussed above are substantially similar, "the original selection, arrangement, and combination of elements, even independently unprotectable elements, is protectable."  (Opp. at 24).  In making this argument, Esplanade relies on *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002).  In that case, the Ninth Circuit considered whether two works, one of which was the television series *City of Angels*, were sufficiently similar under the extrinsic test to survive a summary judgment motion.  *Id.* at 1072.  The Ninth Circuit concluded that, although the similarities between the works were not individually protectable, when considered as a whole the overall selection and sequence of generic elements was substantially similar.  *Id.* at 1074–75.  In *Metcalf*, "[t]he similarities between the relevant works [were] ***striking***":

> Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators

---

**CIVIL MINUTES—GENERAL**                                                          32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)               Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

are in their thirties, were once married but are now single,
without children and devoted to their careers and to the
hospital. In both works, the hospital's bid for reaccreditation
is vehemently opposed by a Hispanic politician.

294 F.3d at 1073–74 (emphasis added).

The similarities between Goldman's work and *Zootopia* are not many or
"striking"; they are few, random, and superficial.  "[A] combination of unprotectable
elements is eligible for copyright protection only if those elements are numerous
enough and their combination constitutes an original work of authorship."  *Satava v.
Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).  That both Goldman's work and *Zootopia*
involve anthropomorphic animals and a protagonist who has landed his or her "dream
job" is not enough for Esplanade to proceed with its case under a "combination of
elements" theory.

Courts routinely decline to apply *Metcalf* when two works' unprotected elements
are not arranged in a strikingly similar fashion.  *See, e.g., Shame on You Productions*,
120 F. Supp. 3d at 1170 ("Shame on You has never argued, nor has the court found,
that there are any 'striking' similarities between the two works at issue in this case.");
*Gable v. Nat'l Broadcasting Co.*, 727 F. Supp. 2d 815, 843-44 (C.D. Cal. 2010), *aff'd*,
438 Fed. Appx. 587 (9th Cir. 2011) ("Here, in contrast [to *Metcalf*], many of the
elements Plaintiff points out are not similar when viewed in context, and those that do
bear some commonality – e.g., lottery winnings, prison time, paying off debts – do not
occur in the same sequence."); *Bernal*, 788 F. Supp. 2d at 1067 ("The elements that
Plaintiff contends are similar are, in fact, markedly different when viewed in context.
Further, Plaintiff has not pointed to any common pattern of unprotected elements that
occur in the same sequence in both works."); *Zella v. Scripps Co.*, 529 F. Supp. 2d
1124, 1138 (C.D. Cal. 2007) ("Plaintiffs fail to point to any string of unprotected
elements in *Rachel Ray* that resembles *Showbiz Chefs* in the sort of magnitude
contemplated by the *Metcalf* court… Courts have routinely rejected *Metcalf* claims
over random similarities.").  This is also a case where *Metcalf* does not apply.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                    Date:  November 8, 2017
Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

In sum, with Goldman's actual work now revealed, Disney's *Zootopia* is not substantially similar to Esplanade's *Looney* / "Zootopia" franchise, and the two works do not bear the type of "striking" similarity that is required to find infringement under the *Metcalf* "combination of elements" theory.

## 2.    *Zootopia* Merchandise and Marketing Materials

In addition to the *Zootopia* movie itself, Esplanade alleges that Disney has infringed Goldman's copyrighted work by selling a variety of *Zootopia*-themed merchandise, such as books, toys, dolls, and figurines, and by displaying / distributing marketing material, such as posters, television advertisements, and movie trailers.  (*See* FAC ¶¶ 49-54, Exhs. 3-4).  Esplanade argues that even if the movie is not substantially similar to Goldman's work, the merchandise and marketing materials might independently infringe upon the work.  (*See* Opp. at 9) ("Disney cannot avoid liability by arguing that its movie is not substantially similar, while ignoring Esplanade's merchandise and marketing allegations.").

Disney's response to Esplanade's marketing and merchandise-related claims is that, where the movie itself does not infringe Goldman's work, it is "unnecessary and redundant for [Disney] to explain that, for example, Plaintiff's rendering of Roscoe the hyena is not substantially similar to a depiction of *Zootopia*'s Nick on a coffee mug or in a movie trailer."  (Reply at 18).  As to Esplanade's claims that Disney's sale of *Zootopia*-themed merchandise independently constitutes infringement, the Court agrees.  Given the Court's conclusion that the *Zootopia* movie characters are not similar to Goldman's *Looney* / Zootopia characters, it would be nonsensical to conclude that those same characters presented in some other format (*e.g.,* a coloring book, mug, puzzle, stuffed animal, action figure, etc.) are similar.  *See Thomas*, 2008 WL 425647, at *3-6 (applying extrinsic test solely to *Finding Nemo* movie and plaintiff's story, even where plaintiff's copyright infringement claim was also premised upon Disney's sale of *Finding Nemo*-themed merchandise).

But Esplanade also specifically alleges that Disney distributed a three-minute marketing video in which *Zootopia*'s Judy "express[es] a central theme in dialogue

CIVIL MINUTES—GENERAL                                                        34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:      Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

copied from the Goldman Zootopia: 'You want to be an elephant when you grow up?
You be an elephant.'" (FAC ¶ 54).  This dialogue is similar to Goldman's description
of Hugo the aardvark, who "believes that an animal can be whatever he wants to be"
and believes that "if you want to be an elephant, you can be an elephant." (FAC Ex. 1
at 3).  In the *Zootopia* movie, Judy delivers the "elephant" remark to Finnick (a small
fox, and Nick's partner in petty crime) at the beginning of the movie in an effort to lift
Finnick's spirits after he was denied service by the elephant clerk at the ice cream
parlor – a brief moment in a 110-minute movie.  Esplanade argues that, as opposed to
the line in the movie, the "elephant" line "make[s] up a substantial quantitative and
qualitative portion of [Disney's] marketing video." (Opp. at 10).

        Both in its Opposition and during the hearing, Esplanade relied upon *Wilson v.
Walt Disney Co.*, No. 14-cv-01441-VC, 2014 WL 4477391 (N.D. Cal. Jul. 30, 2014),
to support its argument that the *Zootopia* trailer could infringe Goldman's work even if
the movie does not.  In *Wilson*, the plaintiff alleged that Disney had infringed upon her
short film *The Snowman* through both its movie *Frozen* and a short teaser for the
movie *Frozen*.  2014 WL 4477391, at *1-2.  The district court granted Disney's motion
to dismiss as to the movie but denied the motion as to the teaser.  *Id.*  In that case, both
*The Snowman* and the *Frozen* teaser were "animated shorts that depict the following
sequence of events":

                "(i) a snowman loses his carrot nose; (ii) the nose slides out
                to the middle of a frozen pond; (iii) the snowman is on one
                side of the pond and an animal who covets its nose is on the
                other; (iv) the characters engage in a contest to get to the
                nose first; (v) the screen pans back and forth from the
                snowman to the animal, set to music, as they endeavor to get
                to the nose; (vi) the contest continues when the snowman and
                the animal arrive at the nose at the same time; (vii) the
                animal ends up with the nose, leaving the snowman (and the
                viewer) to wonder if the snowman's nose will become food

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

for the animal; and (viii) in the end, the animal returns the
nose to the snowman.”

*Id.* at *1.   The district court held that “[t]he sequence of events in both works, from
start to finish, is too parallel to conclude that no reasonable juror could find the works
substantially similar.”

Here, by contrast, the *Zootopia* trailer includes the scene where Judy tells
Finnick that he can be an elephant if he wants to be an elephant, which is similar to the
sentiment held by Goldman’s Hugo the aardvark.  That’s it.  No doubt, as Esplanade
argues, this dialogue constitutes a far more significant portion of the three-minute
*Zootopia* trailer than it does of the 110-minute *Zootopia* movie.  But in the context of
animated anthropomorphic animals, saying (or believing, in the case of Hugo) that
anyone can “be an elephant” – the largest living land animal – regardless of their
genetic attributes, is a fairly generic way of expressing the ideas of following one’s
dreams and/or not letting anything stand in one’s way.  “Ordinary words and phrases
are not entitled to copyright protection, nor are ‘phrases or expressions conveying an
idea typically expressed in a limited number of stereotyped fashions.’”  *Bernal*, 788 F.
Supp. 2d at 1071 (quoting *Narell v. Freeman*, 872 F.2d 907, 911-12 (9th Cir. 1989).
Therefore, even if Disney copied Goldman’s description of Hugo the aardvark, and
even if Judy’s exhortation to “be an elephant” was a much more substantial portion of
the *Zootopia* trailer than the movie, the trailer did not infringe upon Goldman’s
**protectable** work.

As with the *Zootopia* movie itself, Esplanade does not have a viable copyright
infringement claim in connection with *Zootopia* merchandise or marketing materials.

### 3.        “Intermediate” Copying

During the hearing, counsel for Esplanade argued that, in Esplanade’s opinion,
“there has been at least intermediate copying,” and that even if the Court concludes
that “the ultimate product in *Zootopia*” is not similar to Goldman’s work, Esplanade
should be granted the opportunity to assert an “intermediate copying” claim.  The issue

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017

Title:       Esplanade Productions, Inc. -*v*.- The Walt Disney Company, et al.

of "intermediate copying" arises in the context of reverse engineering computer software and utilizing the underlying source code to create a new finished product. The question is whether the creator of the new finished product (*e.g.*, a video game) might be liable for infringing the original product's source code even though its "copying" of that source code was just an intermediate step along the way to creating something that is ultimately new and different – *i.e.,* "intermediate copying."  As stated in Nimmer:

> Does such reverse engineering constitute copyright infringement? To effectuate reverse engineering, it is typically necessary to engage in an act of reproduction or adaptation (or both) of the underlying computer program, and hence the elements of the *prima facie* case would appear to be present. The fact that the user is lawfully in possession of the object code furnishes no defense to engage in such reproduction or adaptation. Although it may suffice to produce only a single copy of the reconstructed source code, one copy is enough to be actionable. ***The copy generated is merely preliminary to further uses, but intermediate copying is no less an infringement of the copyright owner's exclusive reproduction right than is "final" copying.*** The copy thereby generated may be stored solely on the user's computer, but fixation in RAM or on the hard drive may suffice to infringe. And, given the diligence with which programmers safeguard their source code, it may safely be assumed that the user's acts of reverse engineering are neither explicitly nor implicitly licensed. Accordingly, it would seem that reverse engineering satisfies the elements for plaintiffs to prove copyright infringement.

4 *Nimmer on Copyright* § 13.05 (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)               Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

The seminal case on "intermediate copying" in the Ninth Circuit is *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992).  In that case, Sega manufactured video game consoles and cartridges and Accolade manufactured video game cartridges.  977 F.2d at 1514.  Sega licensed its copyrighted computer code to certain independent game developers, but not to Accolade.  *Id.*  Accolade "reverse engineered Sega's video game programs in order to discover the requirements for compatibility with the [Sega] Genesis console," and then "created its own games for the Genesis."  *Id.* at 1514-15.  "As part of the reverse engineering process, Accolade transformed the machine-readable object code contained in commercially available copies of Sega's game cartridges into human-readable source code" and then "generated printouts of the resulting source code" for its engineers to refer to in developing Accolade's own Sega-compatible games.  *Id.*  The Ninth Circuit held that the reverse engineering process constituted "intermediate copying," for which Accolade could be liable notwithstanding the originality of the final-product video games, but ultimately held that Accolade had a "fair use" defense.  *See id.* at 1518-1528.  "[I]ntermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner in section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights."  *Id.* at 1519.

The Court is unable to locate a single case in which the *Sega* "intermediate copying" theory has been extended to impose liability based upon the copying of non-software-related work (*e.g.,* a script, book, cartoon, etc.) in the course of creating a new work that is ultimately dissimilar to the plaintiff's work.  "The [*Sega*] court expressly distinguished cases, like this one, involving the alleged copying of books, scripts, or literary characters, where 'the eventual lawsuit alleged infringement only as to the final work of the defendants.'"  *Quirk v. Sony Pictures Entm't, Inc.*, No. C 11-3773 RS, 2013 WL 1345075, at *6 (N.D. Cal. Apr. 2, 2013) (quoting *Sega*, 977 F.2d at 1518).  The focus of both the Complaint and the FAC is on the ***finished*** *Zootopia* movie, trailer, and merchandise, not on rough drafts, outtakes, and the like.  Therefore, even if Esplanade had included an "intermediate copying" claim in the Complaint or the FAC, that claim would be dismissed.  The Court will not allow Esplanade to file a second amended complaint that includes such a claim now.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)                Date:  November 8, 2017

Title:       Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Accordingly, as to Esplanade's copyright infringement claim (in connection with the *Zootopia* movie, merchandise, and marketing materials), the Motion is **GRANTED** ***without leave to amend***.

### C.    State Law Claims

Esplanade and Disney is each a corporation with its principal place of business in California (FAC ¶ 8, 9); thus Esplanade's copyright infringement claim is the sole basis of this Court's subject matter jurisdiction.  With the copyright infringement claim now dismissed without leave to amend, all that remains are Esplanade's state law claims against non-diverse defendants.  The Court has discretion to exercise or decline supplemental jurisdiction over Esplanade's state law claims.  *See* 28 U.S.C. § 1367(c)(2) ("The district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) ("[A] federal district court with power to hear state law claims has discretion to keep, or decline to keep, them under the conditions set out in § 1367(c)") (quoting *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000 (9th Cir.1997) (en banc)).

Esplanade's failure to state a viable copyright infringement claim does not automatically doom its breach of implied contract, breach of confidence, and Unfair Competition Law claims.  *See Benay*, 607 F.3d at 631 ("because the claim is based in contract, unauthorized use can be shown by substantially similar elements that are not protected under copyright law").  While the Court is cognizant of Disney's argument that Esplanade may "re-file these claims, which would require a state court to undertake the same analysis as this Court and force [Disney] to incur additional fees," such circumstances are not at all unique to this action.  Because the Court has dismissed Esplanade's copyright infringement claim early on in this action and Esplanade could, perhaps, establish Disney's liability under one or more of its state law theories, the Court declines to exercise supplemental jurisdiction over the state law claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 17-02185-MWF (JCx)              Date:  November 8, 2017
Title:        Esplanade Productions, Inc. -*v.*- The Walt Disney Company, et al.

Accordingly, Disney's Motion is **GRANTED** as to Esplanade's California law claims and those claims are **DISMISSED** *without prejudice* to Esplanade's asserting those claims in Superior Court.

## III.    CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** *without leave to amend*. Esplanade's copyright infringement claim is **DISMISSED**.  Esplanade's California law claims are **DISMISSED** without prejudice to Esplanade's asserting those claims in Superior Court.

This Order shall constitute notice of entry of judgment pursuant to Federal Rule of Civil Procedure 58.  The Court **ORDERS** the Clerk to treat this Order, and its entry on the docket, as an entry of judgment.  Local Rule 58-6.

IT IS SO ORDERED.